UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------- x

KEVIN DOWNS,                          :

       Plaintiff,                     :

         -v-                       :

OATH INC.,                            :

       Defendant.                     :

---------------------------------- x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/22/19

18-cv-10337 (JSR)

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

Plaintiff Kevin Downs brings a one-count complaint against defendant Oath Inc. Now before the Court are the parties' cross-motions for summary judgment. Downs moves for summary judgment on the issue of liability, and Oath moves for summary judgment on its defense of statutory immunity under the Digital Millennium Copyright Act. For the reasons below, Downs's motion is denied, Oath's motion is granted, and the case is dismissed.

## Background

Kevin Downs is a professional photographer who does freelance work for the New York Daily News. Defendant Oath Inc.'s Response to Plaintiff's Statement Pursuant to Local Rule 56.1, at ¶ 1 ("Oath 56.1 Counterstatement"), ECF No. 35. Oath Inc. is the owner and operator of HuffPost, which is a media brand with a website at www.huffingtonpost.com. Plaintiff's Opposition to Defendant's Statement Pursuant to Rule 56.1, at ¶ 2 ("Downs 56.1 Counterstatement"), ECF No. 39.

On January 29, 2017, Downs photographed a group of individuals at JFK Airport who were protesting President Trump's "Travel Ban" (i.e., Executive Order 13769). Oath 56.1 Counterstatement ¶ 20. On the same day, Downs licensed his photograph to the New York Daily News, which published it with an article titled "Federal judge grants emergency stay to thwart Trump's refugee ban and halt deportations." Id. ¶ 23. The next day, an article was posted to www.huffingtonpost.com with the title: "Trump's Disastrous Week of Presidency: The Chinese Exclusion Act and the Muslim Ban." Id. ¶ 24. The article – which contained commercial advertisements - used Downs's photograph without his permission. Id. ¶¶ 25, 26, 35.

The article was not written by a HuffPost employee; instead, it was written and uploaded by Grace Ji-Sun Kim, who was a participant on HuffPost's "contributor" platform. Id. ¶ 29. The contributor platform, which HuffPost operated between 2005 and 2018, included over 100,000 contributors who self-published blog posts. Downs 56.1 Counterstatement ¶¶ 3, 8. Contributors were neither employed nor paid by HuffPost, and they were able to publish articles directly on HuffPost without editorial review. Id. ¶¶ 4, 9. Contributors were required to agree to terms and conditions prohibiting them from uploading copyrighted material, id. ¶¶ 6-7, and after articles were

2

published, HuffPost editors would screen them for offensive or illegal content, Oath 56.1 Counterstatement ¶ 7. HuffPost editors would also index articles, change articles' headlines, and copy edit articles' text. Id.

The day after Kim posted her article, a HuffPost editor named Chloe Cohn screened the article for offensive or unlawful content. Downs 56.1 Counterstatement ¶ 24. Cohn also added content tags to the article's metadata and a "related video" link beneath the article. Id. According to Victor Brand, who was Standards Editor for HuffPost at the time the article was published, the edit history of the article shows that the article included Downs's photograph at the time Kim uploaded it. Brand Decl. ¶ 9, ECF No. 26. The edit history also shows that Cohn did not edit the text of Kim's article. Id. ¶ 15. Attached to Brand's declaration are screenshots of the article's edit history that support his statements. See ECF No. 26, Ex. 3.

Downs registered his copyright in his photograph on January 2, 2018, Oath 56.1 Counterstatement ¶ 45, and he filed the instant action on November 7, 2018, ECF No. 1. Downs brings a single claim for copyright infringement. ECF No. 11, at ¶¶ 15-19. Oath answered and raised a battery of affirmative defenses, including, as relevant here, statutory immunity under the

3

Digital Millennium Copyright Act ("DMCA"), absence of volitional conduct, fair use, and laches. ECF No. 15, at ¶¶ 2-18.

Now before the Court are the parties' cross-motions for summary judgment. Downs moves for summary judgment on the issue of liability, and he also moves to dismiss Oath's affirmative defenses. ECF No. 27. Oath moves for summary judgment on its statutory immunity defense. ECF No. 22. Each party opposes the other's motion. ECF Nos. 34, 38.

## Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The movant bears the burden of demonstrating the absence of a genuine dispute of fact, and, to award summary judgment, the court must be able to find after drawing all reasonable inferences in favor of a non-movant that no reasonable trier of fact could find in favor of that party." Palmer/Kane LLC v. Rosen Book Works LLC, 204 F. Supp. 3d 565, 568 (S.D.N.Y. 2016).[1] "[T]here is no issue for trial unless there is sufficient evidence favoring the

---

[1] Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

4

nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

## Analysis

To establish copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). The parties agree that Downs has satisfied both of these elements. However, the parties dispute whether Oath is nevertheless entitled to immunity under 17 U.S.C. § 512(c), which is one of the "safe harbor" provisions in the DMCA.[2]

Under § 512(c), service providers may avoid liability for copyright infringement that occurs "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c)(1). As relevant here, § 512(c)'s safe harbor applies only if a service provider:

(A)  (i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

---

[2] Because the Court finds that Oath is entitled to statutory immunity, it does not address Oath's other affirmative defenses.

5

(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement . . . , responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

Id.

Oath argues that it has satisfied each of the above requirements (as well as other requirements not at issue here) and that it is therefore entitled to immunity as a matter of law. See Memorandum of Law in Support of Defendant's Motion for Summary Judgment Regarding Entitlement to DMCA Safe Harbor 6-17 ("Oath SJ Mem."), ECF No. 23; Defendant Oath Inc.'s Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment on Liability Against Defendant for Copyright Infringement under 17 U.S.C. § 501, at 6-18 ("Oath SJ Opp."), ECF No. 34. Downs argues that Oath has failed to meet its burden – and, indeed, has failed to create a triable issue – as to three of the above requirements. See Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment on Liability Against Defendant for

Copyright Infringement under 17 U.S.C. § 501, at 8-12 ("Downs SJ Mem."), ECF No. 28; Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment Regarding DMCA Safe Harbor 5-10 ("Downs SJ Opp."), ECF No. 38.[3]

First, Downs argues, the infringement here did not occur "by reason of . . . storage at the direction of a user," 17 U.S.C. § 501(c)(1), because Cohn, rather than Kim, was responsible for publication of the HuffPost article with Downs's photograph. See Reply Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment on Liability Against Defendant for Copyright Infringement under 17 U.S.C. § 501, at 4-6 ("Downs SJ Reply"), ECF No. 42. Second, Downs argues, Cohn was "aware of facts or circumstances from which infringing activity [wa]s apparent," 17 U.S.C. § 512(c)(1)(A)(ii) – i.e., Cohn had "red flag" knowledge of infringement - because the photograph in Kim's article had a New York Daily News photo

---

[3] Downs argued in his moving and opposition papers that Oath failed to designate or identify an agent to receive notices of infringement, as is required by 17 U.S.C. § 512(c)(2). See Downs SJ Mem. 9-10; Downs SJ Opp. 5-7. This argument, however, was predicated on a simple misunderstanding of HuffPost's ownership history. See Oath SJ Opp. 9 (explaining that Oath did not exist when Kim's article was posted and that AOL Inc. - HuffPost's owner and operator at the time – had a registered DMCA agent). Accordingly, Downs has since abandoned his argument that Oath failed to designate or identify an agent. See Transcript dated May 17, 2019, at 23:15-20.

credit. See Downs SJ Opp. 9-10; Downs SJ Reply 6-7. And third,
Downs argues, HuffPost "receive[d] a financial benefit directly
attributable to the infringing activity, in a case in which [it]
ha[d] the right and ability to control such activity," 17 U.S.C.
§ 512(c)(1)(B), because commercial advertisements appeared on
the face of Kim's article. See Downs SJ Mem. 11-12; Downs SJ
Opp. 10.

For the reasons discussed herein, the Court concludes that
each of Downs's arguments is unavailing and Downs has failed to
create a genuine dispute as to any of the above requirements.
Accordingly, Oath is entitled to immunity as a matter of law
under the safe harbor in § 512(c).

## I.   By Reason of Storage at the Direction of a User

"The § 512(c) safe harbor is only available when the
infringement occurs 'by reason of the storage at the direction
of a user of material that resides on a system or network
controlled or operated by or for the service provider.'" Viacom
Int'l, Inc. v. YouTube, Inc., 676 F.3d 19, 38 (2d Cir. 2012)
(quoting 17 U.S.C. § 512(c)(1)). This requirement that
infringement occur "by reason of" user storage is not intended
to place a strict "limitation on the ability of a service
provider to modify user-submitted material." Id. at 39; see id.
("[W]e conclude that § 512(c) is clearly meant to cover more

than mere electronic storage lockers."). Instead, while the safe harbor requires some causal connection between user storage and the alleged infringement, the Second Circuit has explained that "the § 512(c) safe harbor extends to software functions performed [by the service provider] for the purpose of facilitating access to user-stored material." Id.

Oath argues that the alleged infringement at issue here occurred by reason of user storage because Kim added Downs's photograph to her article. See Oath SJ Mem. 10-12; Oath SJ Opp. 9-14. Moreover, Oath contends, the safe harbor applies even though HuffPost screened articles for offensive and illegal content, and even though Cohn added content tags and a related video link to Kim's article. See Oath SJ Opp. 10-12. Oath points to the Ninth Circuit's decision in Ventura Content, Ltd. v. Motherless, Inc., in which the court held that infringement occurred by reason of user storage even though the defendant website operator screened out illicit and apparently infringing material. 885 F.3d 597, 607-08 (9th Cir. 2018). Oath contrasts Ventura with Mavrix Photographs, LLC v. Livejournal, Inc., in which the court held that there was a triable issue as to whether infringement occurred by reason of user storage where the defendant website's moderators "review[ed] submissions and publicly post[ed] only about one-third of submissions." 873 F.3d

1045, 1056 (9th Cir. 2017). Because Kim's article was posted directly to HuffPost and Cohn conducted only cursory screening and modification, Oath argues, the instant case is closer to Ventura than it is to Mavrix. See Oath SJ Opp. 11.

Downs responds that the alleged infringement did not occur by reason of user storage. See Downs SJ Reply 4-6. First, Downs argues, there is no evidence that Kim, rather than Cohn, added the photograph to the article. Id. at 4. In fact, Downs suggests, it is "likely that [Cohn] added the Photograph" to Kim's article because Cohn also added content tags and a related video link. Id. (emphasis added). Second, Downs argues, even if Kim added the photograph, Cohn "ultimately optimized and substantively enhanced the Article . . . [and] made the Article ready for mass publication to audiences worldwide." Id. at 4-5. Downs contends that Cohn "made editorial decisions as to what articles were indexed and which were not," and that Kim's article was therefore "subject to a selection process by virtue of Cohn's optimization for Google search indexing." Id. at 5.

Beginning with the issue of who added the photograph to the article, the undisputed evidence demonstrates that it was Kim, not Cohn. As noted above, Oath has put forth screenshots of the article's edit history, see ECF No. 26, Ex. 3, as well as a sworn declaration from Victor Brand, who was Standards Editor

for HuffPost at the time the article was published, Brand Decl.
¶ 9. Downs, in opposition, has offered nothing more than
speculation that Cohn may have added the photograph because she
added a video link as well. See Downs SJ Reply 4. This is
insufficient to create a genuine dispute as to whether Kim added
the photograph (not to mention grossly inadequate to support
Downs's claim that Cohn "likely" added the photograph).
Moreover, while Downs complains that Oath failed to submit
supportive affidavits from Cohn and "Chin" – by whom Downs
presumably means Kim – Downs could have deposed these
individuals himself, and he chose not to. See id. at 4 n.2.

Moving to the question of whether Cohn's cursory screening
and modification place Kim's article outside of the safe
harbor's protections, the case law supports Oath's position over
Downs's. As the Tenth Circuit explained in BWP Media USA, Inc.
v. Clarity Digital Group, LLC, "if the infringing content has
merely gone through a screening or automated process, the
[service provider] will generally benefit from the safe harbor's
protection." 820 F.3d 1175, 1181 (10th Cir. 2016); see Ventura,
885 F.3d at 607-08 (discussed above); cf. CoStar Grp., Inc. v.
LoopNet, Inc., 373 F.3d 544, 556 (4th Cir. 2004) (service
provider not liable for infringement where employees conducted
"cursory" reviews of user-uploaded photographs for copyrighted

and irrelevant material). <u>Mavrix</u> – the only case on which Downs relies – is distinguishable, as the defendant there chose a small subset of user submissions to post publicly. 873 F.3d at 1056. Here, contributors like Kim published their articles directly to HuffPost.

Moreover, the addition of content tags does not deprive Oath of immunity under § 512(c). As the Second Circuit explained in <u>Viacom</u>, "the § 512(c) safe harbor extends to software functions performed for the purpose of facilitating access to user-stored material." 676 F.3d at 39. This is the precise purpose of content tags. Indeed, <u>Viacom</u> approvingly cited to <u>Io Group, Inc. v. Veoh Networks, Inc.</u>, in which the court held that infringing content was stored at the direction of the user even though the defendant website's employees sometimes added content tags after users uploaded videos. 586 F. Supp. 2d 1132, 1140, 1146-48 (N.D. Cal. 2008). Similarly, in <u>UMG Recordings, Inc. v. Shelter Capital Partners LLC</u>, the Ninth Circuit held that "§ 512(c) encompasses the access-facilitating processes that automatically occur when a user uploads a video to [defendant's website]," 718 F.3d 1006, 1016 (9th Cir. 2013), even though these access-facilitating processes included the assignment of content tags, see <u>UMG Recordings, Inc. v. Veoh Networks Inc.</u>, 665 F. Supp. 2d 1099, 1109 (C.D. Cal. 2009).

Based on these cases – and the other considerations discussed above - the Court concludes that Downs has not created a triable issue as to whether the alleged infringement occurred by reason of user storage. The undisputed evidence demonstrates that Kim added the photograph to the article. And Cohn's cursory screening and modification of Kim's article do not place the article outside of the protections of § 512(c).

## II.   Red Flag Knowledge

"[I]n order to be disqualified from the benefits of the safe harbor by reason of red flag knowledge under § 512(c)(1)(A)(ii), the service provider must have actually known facts that would make the specific infringement claimed objectively obvious to a reasonable person." Capitol Records, LLC v. Vimeo, LLC, 826 F.3d 78, 93 (2d Cir. 2016). "The hypothetical reasonable person to whom infringement must be obvious is an ordinary person — not endowed with specialized knowledge or expertise concerning . . . the laws of copyright." Id. at 93-94. Moreover, while statutory immunity is an affirmative defense, "the burden falls on the copyright owner to demonstrate that the service provider acquired knowledge of the infringement, or of facts and circumstances from which infringing activity was obvious, and failed to promptly take down the infringing matter, thus forfeiting its right to the

safe harbor." Id. at 95; see id. ("The plaintiff is, of course, entitled to take discovery of the service provider to enable it to make this showing.").

Downs argues that Cohn had red flag knowledge of infringement because the photograph in Kim's article had a New York Daily News credit. See Downs SJ Opp. 9-10; Downs SJ Reply 6-7. "It is simply not plausible," Downs contends, "that a HuffPost professional would think that an unpaid contributor such as Kim had authority from the Daily News (or a professional photojournalist) to post a photograph that was published just one day before by HuffPost's competitor in the news industry." Downs SJ Reply 7; see id. at 6 ("Any trained professional in Cohn's position should have known that the photograph was infringing based on the attribution to New York Daily News." (capitalization omitted)).

As Oath explains, however, immunity under the DMCA's safe harbor does not depend on whether a "HuffPost professional" or a "trained professional in Cohn's position" would or should have known that the photograph in Kim's article was infringing. Instead, immunity depends on whether the infringement would have been "obvious to a reasonable person . . . not endowed with specialized knowledge or expertise concerning . . . the laws of

14

copyright." Capitol Records, 826 F.3d at 93-94. Here, the Court concludes that infringement would not have been so obvious.

The Court's analysis on this issue is guided by the Second Circuit's decision in Capitol Records, which is closely on point. There, defendant Vimeo operated a website to which users uploaded videos. Id. at 81. Vimeo's employees would "identify some videos with a 'like' sign, occasionally prepare commentary on a video, offer technical assistance to users, participate in forum discussions, and at times inspect videos suspected of violating Vimeo's policies." Id. at 84. Unhappy with the unauthorized use of sound recordings in user-uploaded videos, record and music publishing companies sued Vimeo for infringement. Id. at 81. Plaintiffs argued that Vimeo had red flag knowledge of infringement in cases where an employee viewed a "video containing all or virtually all of a recognizable, copyrighted song." Id. at 93.

The Second Circuit rejected plaintiffs' argument for several reasons. As relevant here, the court explained that an "employee's viewing might have been brief," such that the employee did not ascertain that the video contained a copyrighted audio recording. Id. at 96. Furthermore, the court continued, the employee might not have been aware that the video contained a copyrighted audio recording because the employee

might have been viewing the video for "many different business purposes," such as "classification by subject matter" or "sampling to detect inappropriate obscenity or bigotry." Id. And even assuming that the employee was aware of the copyrighted recording, the court concluded that the employee could not be expected to distinguish between infringements, on the one hand, and fair or authorized uses, on the other. See id. at 97.

Applying this reasoning to the instant case, the Court holds that HuffPost did not have red flag knowledge of the alleged infringement in Kim's article. As in Capitol Records, Cohn's viewing of Downs's photograph may have been brief. And as in Capitol Records, Cohn was viewing Kim's article for multiple purposes, including subject matter classification and screening for offensive content. It is of course possible that Cohn saw the New York Daily News photo credit, but Capitol Records makes clear that this possibility is not enough to create a triable issue as to red flag knowledge. Instead, "the burden f[ell] on [Downs] to demonstrate that [Cohn] acquired knowledge of . . . facts and circumstances from which infringing activity was

obvious," id. at 95, and Downs failed to take discovery or
otherwise adduce evidence sufficient to make this showing.[4]

Moreover, even if Downs showed that Cohn was aware of the
New York Daily News photo credit, Capitol Records suggests that
Oath still would be entitled to summary judgment on the issue of
red flag knowledge. Although the fair use and licensing issues
raised by the inclusion of a sound recording in a video are not
identical to those raised by the inclusion of a photograph in a
blog post, the Court does not see how Cohn, any more than the
employees in Capitol Records, could be expected to distinguish
between infringements and fair or authorized uses. Accordingly,
the Court holds that Downs has failed to create a triable issue
as to red flag knowledge.

## III. Financial Benefit and the Right and Ability to Control

"Apart from the foregoing knowledge provisions, the
§ 512(c) safe harbor provides that an eligible service provider
must 'not receive a financial benefit directly attributable to
the infringing activity, in a case in which the service provider
has the right and ability to control such activity.'" Viacom,

---

[4] At argument, the only explanation Downs gave for failing to
depose Cohn was that "the burden is on [Oath] to establish [its]
defense." See Transcript dated May 17, 2019, at 5:8-9. Although
this may be true as a general matter with respect to Oath's
statutory immunity defense, Capitol Records makes clear that
Downs has the burden of proving red flag knowledge.

676 F.3d at 36 (quoting 17 U.S.C. § 512(c)(1)(B)). Downs argues that Oath fails to satisfy this requirement because HuffPost received a financial benefit from the commercial advertisements that were visible on the face of Kim's article. See Downs SJ Mem. 12; Downs SJ Opp. 10. Furthermore, Downs contends, Oath had the right and ability to control Kim's article because HuffPost "engag[ed] in human supervision and review [of] content posted to the Website." Downs SJ Mem. 13; Downs SJ Reply 8.

Both of these arguments fail. Beginning with the question of whether HuffPost "receive[d] a financial benefit directly attributable to the infringing activity," it is not enough for Downs to show that HuffPost ran commercial advertisements on its website. If that were sufficient, then practically every revenue-generating website would satisfy the financial benefit prong of 17 U.S.C. § 512(c)(1)(B).

Instead, Downs must put forth evidence of a connection between the allegedly infringing activity and the financial benefit that HuffPost received. In Columbia Pictures Industries, Inc. v. Fung, for example, the Ninth Circuit held that advertising revenue met the financial benefit prong where the defendant "promoted advertising by pointing to infringing activity; obtained advertising revenue that depended on the number of visitors to his sites; attracted primarily visitors

who were seeking to engage in infringing activity . . . ; and encouraged that infringing activity." 710 F.3d 1020, 1045 (9th Cir. 2013). In Ventura, by contrast, the court held that the financial benefit prong was not met where the defendant "did not advertise itself as a place to get pirated materials." 885 F.3d at 613. Although the court recognized that the more content hosted on defendant's website, "the more users it would attract, and more views would lead to more advertising revenue," the court explained that "[t]he words 'the' and 'directly' in [§ 512(c)(1)(B)] . . . must mean that some revenue has to be distinctly attributable to the infringing material." Id.

Here, Downs has made no showing that the advertising revenue HuffPost received was "distinctly attributable" to infringing activity. There is no evidence that HuffPost encouraged infringement, or that it promoted advertising by pointing to infringement, or even that its users primarily engaged in infringing conduct. To the contrary, the undisputed evidence shows that HuffPost simply ran advertisements on user-generated articles, some of which inevitably contained infringing material. This case is thus much closer to Ventura than it is to Fung. Indeed, the financial benefit analysis likely favors Oath even more than it did the defendant in Ventura, as the defendant in Ventura operated a website that

hosted nearly 13 million pornographic photographs and videos that were uploaded by users. Id. at 600. The Court suspects that infringing content was a more significant driver of advertising revenue on the Ventura defendant's website than it was on HuffPost's contributor platform.

Even if the Court were to assume, arguendo, that HuffPost "receive[d] a financial benefit directly attributable to the infringing activity," Downs has nevertheless failed to show that HuffPost had the "right and ability to control such activity." As the Second Circuit has explained, the "right and ability to control" must "require[] something more than the ability to remove or block access to materials posted on a service provider's website." Viacom, 676 F.3d at 38. Otherwise, the ability to remove or block access, which is a "prerequisite to safe harbor protection under § 512(c)(1)(A)(iii) & (C) would at the same time be a disqualifier under § 512(c)(1)(B)." Id. at 37. Instead, possession of the "right and ability to control" contemplates circumstances in which "a service provider exert[s] substantial influence on the activities of users." Id. at 38; see Ventura, 885 F.3d at 613 ("To have the right and ability to control, a service provider must be able to exert 'substantial influence' on its users' activities.").

Based on the evidence before the Court, Downs has failed to create a genuine dispute as to whether HuffPost exerted substantial influence over contributors' activities. Instead, the undisputed evidence shows that contributors self-published their articles directly to the website and that HuffPost engaged in cursory screening and modification. This level of involvement is insufficient as a matter of law to establish that HuffPost had the "right and ability to control" infringing activity by members of its contributor platform. Accordingly — and for the reasons discussed above — the Court holds that Oath is not disqualified from the DMCA's safe harbor by reason of failure to satisfy the requirements of § 512(c)(1)(B).

## Conclusion

In sum, the undisputed evidence shows that: (1) the allegedly infringing use of Downs's photograph occurred "by reason of . . . storage at the direction of a user," 17 U.S.C. § 512(c)(1); (2) HuffPost was "not aware of facts or circumstances from which infringing activity [wa]s apparent," id. § 512(c)(1)(A)(ii); and (3) HuffPost did "not receive a financial benefit directly attributable to the infringing activity, in a case in which [it] ha[d] the right and ability to control such activity," id. § 512(c)(1)(B). Downs's motion for

summary judgment is therefore denied, Oath's motion for summary judgment is granted, and the case is hereby dismissed.

The Clerk is directed to close the entries at docket numbers 22 and 27, and to enter judgment dismissing the case with prejudice.

SO ORDERED.

Dated:     New York, NY

           May 22, 2019                    JED S. RAKOFF, U.S.D.J.